Case number 1761-55, Tennessee Clean Water Network et al. v. TVA Oral argument, not to exceed 15 minutes per side Mr. Alif Forlee, Appellate Mr. Alif Forlee, Appellate Good morning, Your Honor. May it please the Court, David Alif for Appellant TVA. With the Court's permission, I'd like to reserve four minutes for rebuttal. All right. Like the previous case, the question here is which statutory and regulatory framework should govern the conveyance of pollutants by groundwater. And we agree with the appellees in the previous case that Congress has answered that question with RCRA and the CCR rule. And TVA is working right now under that correct framework to remedy groundwater issues at Gallatin and to close its coal ash facilities in a way that protects the environment, including both groundwater and surface waters. And if the Court would indulge me, I'd like to, in the interest of efficiency, respond to some of the issues raised in the prior argument and then focus on some things that are unique to this case, in particular the remedy issue and the point source collateral attack issue. We agree with the appellees in the prior case that the coal ash facilities, like the ones at Gallatin, cannot be point sources under the Clean Water Act. Also, we disagree with the appellants in the prior case. I think that's a question of law. I think the Courts have recognized that. Also, we agree with the appellees in the prior case that groundwater is non-point source pollution and that Congress drew a regulatory bright line at groundwater in passing the Clean Water Act. And we also agree that RCRA is the better fit. And I wanted to come back to a question that you asked, Judge Gibbons, about whether RCRA addresses this very situation. And the answer is yes. And I would cite the Court to the definition of disposal in 42 U.S.C. 6903, which is very broad and it talks about any kind of spilling, leaking, dumping that could make solid waste constituents reach the ground, the groundwater, or the surface waters. And so Congress came back in 1976 and was very specific in addressing groundwater pollution. And Congress has acted again with specific regard to coal ash facilities, like the ones at Gallatin, to deal with coal ash facilities and deal with it under a RCRA-based framework. And that's the framework under which TVA is operating right now at its Gallatin facilities. I also wanted to come back to a question, Judge Clay, that you asked about the Ninth Circuit and Fourth Circuit decisions in the County of Maui cases and the Kinder Morgan cases. Here, unlike the previous case, we do have a factual record here. And even if the Court were inclined to take a look at those cases and the differing atextual standards that those courts invented to stretch the Clean Water Act to cover groundwater migration, they don't fit on the facts of this case. The proof wasn't sufficient to show traceability primarily. Both of those cases, the Maui case, required a defined beginning and a defined end point. And also traceable and identifiable points of discharge and traceability in measurable quantities in the Fourth Circuit case. None of that evidence was presented here. In fact, what the district court found was that none of the science was capable of identifying when, where, or how long or how pollutants had entered the water. The district court found that the plaintiffs had been unable to disentangle the effects of things that had happened years and decades ago. Also found that the sampling evidence was inconclusive, which is very different in the situation in the Ninth Circuit case. And more importantly, it specifically found that the plaintiffs had been unable to identify a single specific sinkhole or other leaking feature in the present day. And so what the district court did then was it was left to theorize in its own words in paragraph 433 of its findings and conclusions and ultimately to infer the nature of these pathways. And that's reversible error. Also, with regard to the Ninth Circuit's test, they added a de minimis element to that test. And under the facts of this case, we would fall within that de minimis standard because in stark contrast to the facts of this case, in the Ninth Circuit case, there was definite volumetric evidence about the amount of what had gone through the wells and the percentages of the amounts of wastewater that ultimately entered the oceans. And so it's very different than the facts of this case. And I think that lack of traceability ultimately led to the district court's conclusion on the remedy issue. And what the district court said was that the evidence was not adequate to fully or accurately assess the extent or the impacts of any unauthorized discharges. And it's black letter law that a statutory violation alone is not enough to equal irreparable harm. Something more is required. That's what the Supreme Court said in Amico. And it's also the law of this court and the Supreme Court that an injunction must be narrowly tailored to the harm it purports to address. And here, the extreme remedy of excavating over 14 million cubic yards of coal ash is wholly disproportionate to the scant evidence of harm that the district court found. But I do want to be very clear. TVA is not saying for a minute that there are not groundwater issues to address at Gallatin and there's not work for TVA to do. Far from it. Didn't the district court make the finding that the remedy it was ordering was the only feasible way to address the problem, notwithstanding the cost? That was the district court's finding, yes, Judge Clay. But I think that goes to the fact that the district court failed to take account of what is involved in the CCR rule process, the one that Congress has endorsed to close in place these coal ash facilities. The district court described that as the bare minimum. And that's just not the case. What was said in the CCR rule is that both methods of closure can be equally protective of the environment. And the evidence in this case showed that not only could the closure plan that TVA put forward for the facilities at Gallatin meet TVA's obligations under the CCR rule, but would also be sufficient to address the groundwater migration issues in this case. And the district court simply ignored evidence that closure in place is not just slapping a cap on the facilities and walking away. What's built into the CCR rule is a RCRA corrective action framework. And the district court didn't consider that. Didn't the court decide that if you built those caps over the locations, the groundwater could still penetrate laterally from those locations so that that was not an adequate solution? That was what the district court said in paragraph 494. So how was the district court factually incorrect in that finding? I think if you look back at that paragraph 494, the findings and conclusions, what the district court said was the evidence of what Your Honor just mentioned was uncertain, contradictory, and unclear, and nevertheless made the decision to give really short shrift to closure in place and really ignored the fact that closure in place comes with it 30 years of closure performance monitoring. And what is built into the CCR rule is a corrective action framework. And that was discussed. It's at volume three of the trial testimony, pages 145 to 149, where the district court went back and forth with TVA's witness. Just to understand, are you quoting a witness or a report, or is this instead your argumentation about why the groundwater penetrating laterally would be a problem not subject to this correction? Yes, Your Honor. This is testimony that's in response to that point, that the CCR rule contains a corrective action option, and that's on volume three of the trial testimony that's documented in the record number 236 and pages 145 to 149. And the witness explains that with closure in place comes corrective action, and there's a long history under both RCRA and CERCLA of technologies to address groundwater migration. That includes things like groundwater pump and treat, interceptor wells, the construction of barrier walls, and those options are available. As the Court of Appeals, what are we to do about the fact that the district judge was not persuaded by that testimony? Well, I think in that situation, it goes back to the balancing that the district court undertook. And our position is that was an abuse of discretion because the district court did not give credence to that entire process that after five years of study was laid out and endorsed by Congress to address this very situation, and not only just the closure of CCR facilities, but also groundwater migration issues. And actually, Your Honor, the only competent engineering testimony in the record was that this solution, the closure in place solution under the CCR rule, would be adequate under the CCR rule, but also to address the groundwater migration issues in this case, and we think that's an abuse of discretion not to consider that. And on top of that, to discount the risks associated with closure by removal, of which there are many, and there was ample testimony in the record discussing some of those risks. For example, the increase in the risk of karst formation and offsite groundwater migration simply because the length of time required to excavate a massive site like that which is at Gallatin. And so on balance, it's that cursory consideration that was given and the lack of narrow tailoring, and really what the testimony showed was an infeasible solution, which was significant to the Supreme Court in winter, which we think just underscores the district court's abuse of discretion. And in the final minute or so that I have, I wanted to turn to TVA's collateral attack and permit shield points. Those arguments are addressed in our brief at length, but very briefly, as for the non-registered site, which is the legacy site, it's not a point source, and the appellees have no response to the argument that the state of Tennessee's decision to regulate that as according to its solid waste authority There is a state lawsuit involved here. Yes, Your Honor. What happens to that state lawsuit vis-à-vis the federal lawsuit? Thus far, Your Honor, they've been proceeding in parallel tracks, and I don't think, now the remedial outcome could have an impact on the state lawsuit, but as of right now, the state is proceeding against TVA under its state, primarily its state solid waste authorities, and so they are two separate lawsuits, one under the Federal Clean Water Act and one under state law, primarily solid waste law. Well, if they come to different conclusions, what happens? I suppose, Your Honor, it would depend on what the ultimate conclusion was. I think there's a possibility, though, that if the district court were affirmed, it would likely impact the remedial outcome in the state case. As for the complex, the district court committed a legal error. The permit shield analysis, as this court held in hazard, it starts where the express terms of the permit stop, and the inquiry is what did the regulator reasonably contemplate, yet declined to permit. The district court ignored the teaching of hazard because it refused to consider evidence for the permitting process, which specifically showed the state of Tennessee knew about and chose not to impose NPDES permitting conditions for groundwater migration at Gallatin. I see that I'm out of time. Thank you. Thank you. Good morning. My name is Frank Holloman, and I'm here, of course, for the appellees. I'd like to start on a dispositive issue for most of this site that was not mentioned by my colleague and didn't come up in the prior argument because it wasn't present in that case, and that is here TVA operates the ash pond complex, which is most of the ash at this site, under a permit, Clean Water Act permit, issued by the state of Tennessee, and it operates this site as a wastewater treatment facility. The district court found that TVA violated a clear provision of that permit, a separate provision apart from the hydrologic connection issue under the Clean Water Act, apart from any rippery issue, and specifically, that provision says, with respect to a wastewater treatment facility, it's a very common sense provision, and it says any material that TVA must prevent the entrance of any material removed by treatment into surface water and must prevent it from polluting any surface water. The district court found, of course, that that provision was being violated because waste coal ash materials at the bottom of this lagoon were entering the Cumberland River and polluting it, and the state of Tennessee, in its amicus brief to this court, says, and I quote as follows, that the rulings of the district court regarding the NPDES permit, and the court found the permit was being violated, issued by Tennessee for the defendant's ash pond complex, comport with how TDEC interprets and implements its NPDES permitting program and its solid waste management program. So the court was faced and found a clear violation of a permit provision. Was the violation of the permit any part of the state action? No, sir. Not this part. No, sir. In fact, the district court judge was careful to parse it to the extent the state, in its state action, was prosecuting against only groundwater contamination under this provision. The court said that's covered by the state action, that the state is proceeding, but that the state is not pursuing the pollution of the Cumberland River under this provision, and therefore we could bring that claim in federal court, and therefore he found a violation, and therefore the state of Tennessee confirms to this court that his ruling is consistent with how they apply their own permit for this wastewater treatment facility. So your argument is we don't have to worry about the Clean Water Act or anything, just look to the state-issued permit, and if they violated it, you've stated the cause of action. Yes, sir, for the ash pond complex. And I'll get to the non-register site in a minute, because that's not covered by the permit, but for the ash pond complex, what you have said is exactly my point. Exactly. Now, I hadn't necessarily planned to make this my principal argument, but since RCRA has come up from my other colleagues, I do want to respond to that. First of all, this permit exists independently of RCRA. So the judge under Weinberger v. Romero-Barcello, he had an obligation to enforce the Tennessee permit, and Tennessee has said what he did is consistent with what we do, and has told the court that. But in addition, if you look further at RCRA, under RCRA itself, under section 6905, it says RCRA applies only to the extent that it does not conflict with the Clean Water Act. In other words, Congress made clear the Clean Water Act takes precedence over RCRA, not that RCRA's application would take precedent over the Clean Water Act. I don't think anybody said that. I think the argument goes that the Clean Water Act doesn't apply because there's no point source, and therefore RFCA applies. I think that's more the argument. As to that argument, Your Honor, that came up earlier about the point source, remember, as I began with, Tennessee has permitted this. This is a wastewater treatment facility. That is the heart of the point sources that the Clean Water Act wanted to control and to deal with. It's a wastewater treatment facility. In the definition of point source, it lists containers, and this is a container. By the way, it's not an exhaustive list. It lists wells. Wells don't connect to the river, but the pollution can flow from the well. It lists concentrated animal feeding operations, CAFOs. Unlike my, contrary to what my colleague for the appellee said in the last case, if something's big, that doesn't mean it's not a point source. A CAFO is a big territory, big acreage. Congress didn't say you had to be small to be a point source. It said you had to be a discrete and confined, in this instance, container. And the plain language of the Act says that the Clean Water Act applies if any pollutant, to the addition of any pollutant to adapt water from any point source. It doesn't say by a point source. It doesn't say through a point source. It doesn't say directly to, as Justice Scalia pointed out in Rapanos. And there's no justice disagreed. And let me say, Your Honor, there are many, many cases which have held that coal ash lagoons are indeed point sources. There's a consolidated coal case in the Fourth Circuit. There are the Yadkin, the Virginia Electric, the Cape Fear cases. And there are many other cases out there where sediment ponds and similar facilities have been determined to be point sources. Let me ask one other question because I know your time is limited. What effect of any does the state action have? Well, the state has said that, the state of Tennessee itself has said, that the judge's determination, the federal judge's determination, is perfectly consistent with what it's doing in the state action. And in the state action, the state has actually come to the conclusion, as did the district judge, that the only appropriate remedy is excavation. So the state, if it follows the federal court, might just as well dismiss their action? Well, not necessarily. We can't predict that. I would say this act, federal action, is much further along. We've been to trial and final judgment. Well, if the federal court holds or we hold the way you want us to, then the state action would be dead. Is that correct? I would think the state of Tennessee would say. The remedy is correct. Well, I'm sorry. No, I'm sorry. I think as a practical sort of curbside equity evaluation, the court has a point there. It might be once a remedy is in place, that might resolve the whole issue. I think the state of Tennessee would say, though, it has the right and obligation to enforce its own state laws and make sure it has an enforceable state remedy in addition to the federal remedy. I might point out also that TVA has been doing everything it can to get that case out of state court. It removed it to federal court and now it even has a mandamus action pending in this case, in this court, attempting to mandamus the district court for remanding it back to the state. So the state action is not as far along as this one, but I think you have a point that, one, the remedy ordered by the district judge is a remedy that both the state and the district judge concluded were appropriate remedies. I'd like to point out, if I could, on the issue of the Clean Water Act and hydrologic connection. If the court were to rule that the Clean Water Act does not apply when pollutants move from a point source into a waterway, in other words, they're from a point source and they're in the waterway, simply because the facility is not on the river's edge, that would disrupt the way the Clean Water Act has been administered for decades. For example, years ago, the EPA adopted a regulation for these so-called CAFOs and it expressly regulates them based on their hydrologic connection to rivers, like the Cumberland River, for example. And this very same argument was made then and the Second Circuit rejected it and said, no, the Clean Water Act does apply. And so states like Michigan and Tennessee and Texas and Idaho and other states have regulated CAFOs on that theory. There are permits issued by EPA and the states in the country for mining and oil and gas, as well as CAFOs and sewage treatment, which take into account this hydrologic connection. All that would be thrown into question. And the second thing that would happen is what my colleague in the other case referred to, and that is this would mean under the Clean Water Act, it would become a game. All polluters would have to do is pull their pipes back from the river, bury them, maybe even not bury them, just pull them back from the river. And since the point source, according to them, doesn't connect directly to the river and transport it directly to the river, there's no coverage. Well, that would create a huge gap in how the Clean Water Act applies throughout the United States. There is a huge weight of judicial authority that supports the position of the district court. The 2nd Circuit, the 4th Circuit, the 7th Circuit, the 9th Circuit, and the 10th Circuit. And there's no circuit that I'm aware of when faced with a situation where there was actually a direct hydrologic connection between the pollution of the river and a wastewater treatment plant, and said the Clean Water Act does not apply. Let me address also this issue of the CCR rule so I can deal with that quickly if I may. The CCR rule says expressly in Section 257.52 of the Coal Combustion Rule that compliance with that rule does not excuse compliance with any other federal or state law. And contrary to what my colleague said, EPA says expressly in the preamble and the rule that this is merely a minimum set of standards for storage. But what it does not address anywhere in that rule, for that matter, anywhere in RCRA, is the pollution of a navigable water like the Cumberland River. And I would like to point out that EPA, under its authority, has adopted a regulation under RCRA which specifically provides that RCRA does not apply to point source discharges. And exactly what we have here is a discharge which is an addition of any pollutant to navigable waters from a point source that is a wastewater treatment facility. Finally, as to the remedy, the judge did everything he could to balance this case. But he was cognizant that under Weinberger v. Romero-Barcello, he doesn't have to order an immediate remedy, but he has to bring them into compliance. Federal courts do not rewrite permits. They do not rewrite Acts of Congress, of course. They certainly don't rewrite permits. And the judge had no alternative but to bring them into compliance. And he looked for ways, and he looked to see if it could be permitted, and he saw Tennessee this year refused to permit exactly what TVA asked them to permit to get around this decision. Instead, the Tennessee agency said, no, your permit does not authorize your discharge of this coal ash material from the bottom and sides of this lagoon through these karst tunnels and conduits into the Cumberland River. So what the judge did, after trying every solution he could think of, adopted the only one that would cure the violations, bring TVA and the remedy into compliance, and he ended up adopting the remedy that the state of Tennessee, after considering all economic issues, reached on its own. And with that, Your Honors, I'm out of time. I still think I'm out of time. Yeah, you are.  Thank you. Just a few brief questions. So you've got not only the plaintiffs against you, the TVA sounds as though the state of Tennessee is not in sync with your client either. Yes, Your Honor, that is our lot. It appears at the present. And a word about the state case. The state ultimately will have to prove that it's entitled to the relief that it's seeking under state law. And I can understand why the state would like this court to relieve it of its burden of proof, but dependency of the state action does not answer the questions in this case. Number one, whether there's been a Clean Water Act violation, and number two, whether the remedy imposed by the district court was an abuse of discretion or is appropriate under the federal Clean Water Act. And as to the specific permit provisions that Judge Strachanek had asked about earlier, generally speaking, permits are interpreted according to contract principles and according to principles of questions of law. And at the time of the permit's formation, if you will, the state of Tennessee specifically told TVA in response to comment 13 that no NPDES permit conditions would be established for groundwater migration. That's what they told the public, and that's what they informed TVA. And for that reason, the permit has to be read with that in mind. And so it doesn't make any sense to read those specific provisions as barring groundwater migration when the regulator specifically told us it wasn't imposing those kinds of conditions. In addition to the fact that the plain language itself, as we've mentioned in our briefs, don't support the reading of the district court on those provisions. My colleague was correct. Those provisions do not govern the NRS, so it would not affect the decision as to the non-registered site. It's a separate site. But on those specific permit provisions, in the state's brief before this court, it did not endorse the district court's interpretation of those provisions. And it just issued TVA a new permit. And it's attached to TVA's July 6th 28J letter. And in that new permit, the state's interpretation of the removed substances and sanitary sewer provisions supports TVA's interpretation. Also, a word about the CCR rule. And my colleague had mentioned that it doesn't address effects on surface waters, on NAVIG waters. That's not correct. In Section 257.102, the closure performance standards for the closure of CCR facilities specifically requires that closure be conducted in a manner that to the maximum extent feasible addresses leachate contamination from coal ash facilities to groundwater and to surface water. So it does address it. And I also wanted to respond to the point that the judge didn't have any alternatives. The trial court didn't have alternatives. It had to order the remedy that it ordered. And that's not correct. In fact, the alternatives are set forth on the face of the CCR rule itself. And that is RCRA corrective action. There are numerous technologies, long tested, have been used for decades to address this very kind of groundwater migration to prevent groundwater migration from going off site. And I mentioned a few earlier, but they're well established. It's possible to pump and treat groundwater, to install walls, to block groundwater flow to the river, and also to create what's called reverse groundwater gradient, to actually move groundwater back into the site. So there's a suite of technologies that the district court simply didn't give consideration to. And so for all these reasons, your honors, TVA would request that the judgment below be reversed or in the alternative that the injunction be vacated and the case remanded for the court under Weinberger to consider whether an injunction should issue, especially in light of the fact of TVA's new permit and considering TVA's obligations under the CCR rule, or if necessary, a proper application of the traditional framework for the extraordinary remedy of injunction. Thank you. Thank you.